UNITED STATES *v.* WILLIAM STECK & CO., INC. (No. 4303)[1]
WILLIAM STECK & CO., INC. *v.* UNITED STATES (No. 4304)

---

[1] C. A. D. 144.

188

*Charles D. Lawrence*, Acting Assistant Attorney General (*Daniel I. Auster*, special attorney, of counsel), for the United States.

*Brooks & Brooks* (*Frederick W. Brooks, Jr.* of counsel) for William Steck & Co., Inc.

[Oral argument October 1, 1940, by Mr. Lawrence and Mr. Frederick W. Brooks, Jr.]

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges

BLAND, Judge, delivered the opinion of the court:

The instant cross appeals involve the question of the proper classification of and duty assessment upon 149 bales of merchandise invoiced as "flax waste." The importation was made by William Steck & Co. of New York, dealers in all kinds of "waste materials such as flax, linens, jutes, waste paper, rags, and so on." The merchandise was shipped from Belgium. Before the importation of the instant merchandise, a sample, submitted by the European shipper, was shown by Steck & Co. to the Cannon Mills at Kannapolis, N. C., which purchased the importation. The merchandise was unloaded and entered at the port of Charleston, S. C., in 1933.

The Collector of Customs classified the merchandise under paragraph 1001, Tariff Act of 1930, as flax noils, and assessed the same with duty at 1 cent per pound. The importer filed protest against the said action of the collector and claimed that although the merchandise had been entered as flax waste at 10 per centum ad valorem under paragraph 1555 of said act, it should have been classified as free of duty under paragraph 1750, the protest stating that it was "only suitable for papermaking purposes."

The pertinent portions of the two paragraphs here involved follow:

PAR. 1001. * * *; flax tow, flax noils, and crin vegetal, twisted or not twisted, 1 cent per pound; * * *

PAR. 1750. Rag pulp; paper stock, crude, of every description, including all grasses, fibers, rags, waste (including jute, hemp, and flax waste), shavings, clippings, old paper, rope ends, waste rope, and waste bagging, and all other waste not specially provided for * * *.

The trial court sustained the protest as to 50 bales, but held that as to the remaining 99 bales, the proof was not sufficient to warrant

sustaining the protest, and the same was overruled as to all the merchandise except the 50 bales.

The Government has appealed from that portion of the judgment which sustained the protest as to the 50 bales, and the importer has appealed from the judgment of the trial court as to the 99 bales.

The bales in the shipment were numbered consecutively from 1 to 149, inclusive, and of these bales, the collector designated 15, numbered from 1 to 15, inclusive, for examination by the examiner. The bales were examined and samples were taken ·from them. These samples were retained until 1935. The examiner testified that owing to an investigation being made as to the unnecessary accumulation of samples it was decided to destroy, among other samples, the greater portion of those which had been taken from the 15 bales.

The examiner sought the advice of the Customs Information Exchange at New York and sent it a part of the composite sample taken from the aforesaid 15 bales. The examiner, acting upon the advice of the Customs Information Exchange, and relying upon his own judgment, advisorily classified the merchandise as above stated.

When the car containing the imported merchandise arrived at Kannapolis, N. C., importer's witness, Ray A. Holshouser, who was superintendent of the carding and spinning operations in the Cannon Mills and who had been employed by that company for many years, inspected and examined the merchandise. He testified that he opened 50 bales and that in each of them he found cotton threads and threads of various colors, red, black, green, and blue, which made the importation wholly undesirable for the manufacture of the "high grade" Cannon towels which are woven from flax or flax noils. Upon the opening and examination of the 50 bales, he rejected the entire shipment of 149 bales and notified William Steck & Co. of such rejection. He sent them a sample of the merchandise which he had obtained from the 50 bales. The merchandise was thereafter shipped to the Wardlow Thomas Paper Mills, Middletown, Ohio.

The record shows that William Steck & Co. took the matter up with the Belgian exporter and secured a proper reduction from the purchase price, based upon the understanding that the merchandise was not suitable for the purposes for which it had been sold and that it would be necessary to sell it as paper stock.

William Charles Steck and Arthur Rosenfeld, both members of the Steck firm, testified concerning the character of the merchandise which Steck examined at the plant of the Wardlow Thomas Paper Co. A sample of the merchandise taken from the 50 bales by the Cannon Mills Co., which contains the colored, twisted threads and other foreign matter, was introduced in evidence as exhibit 2.

There is much testimony in the record as to what constitutes flax noils in the tariff sense. The gist of the testimony is that the non-

fibrous portion of the flax plant is removed by a hackling operation and that the fibrous portion is then put on a spreadboard and formed into a sliver. The best of the product is drawn and spun and the inferior quality, tow, is carded or combed. The inferior quality is dirty. Combing removes the dirt.

The record shows that flax noils, which are, in one sense, a waste, are a reclaimed waste, and ordinarily are, after spinning, woven into cloth. The weight of the testimony shows that the involved merchandise consists of a mixture of wastes and we think the testimony as a whole, which included the evidence given by men engaged in buying and selling similar merchandise for more than a quarter century, shows that the instant merchandise belonged to a class which never had but one use in this country, and that use was in the making of paper.

Much of the controversy revolves around the two exhibits introduced in evidence—Exhibit 7, which consists of a mere handful portion of the composite sample taken from the 15 bales examined by the examiner, and Exhibit 2, which consists of about a bushel in composite form taken from the 50 bales as aforesaid. It appears from the record that it might have been possible to select the handful, Exhibit 7, from some portion of one or more bales which would not be representative of the merchandise as a whole.

The entire shipment consists of 62,461 pounds; the average weight of the 149 bales was, therefore, approximately 419 pounds. The trial court rendered judgment on the basis of the average weight of each of the bales in the entire shipment. The correctness of this action is strongly criticized by the Government.

In view of our conclusion as to the character of the entire importation, we think that the court below correctly found that the 50 bales, regardless of the manner of their identification, or of their weight, were not the kind of merchandise provided for in said paragraph 1001 as flax noils, and that the record also abundantly supports the contentions of the importer that the entire shipment should not have been classified as flax noils and assessed with duty at 1 cent per pound.

We do not feel justified in extending this opinion by quoting all the pertinent testimony which has to do with the character of the merchandise. The record consists of nearly one hundred pages of printed matter. Suffice it to say that well-qualified experts who sold this character of merchandise for many years never knew it to be used for anything but in paper making. Some of them expressed great surprise that anyone would suggest that this character of merchandise would be used in spinning mills. Three uses were disclosed for flax wastes, namely, spinning, paper making and stuffing—such as upholstery and mattress stuffing: The record shows that the entire

shipment, including the 50 bales, was not fit for any purpose except for making paper. For instance, Mr. Steck stated that Exhibit 2 was representative of the shipment, having referred to the shipment as the carload of 149 bales which was shipped to the Wardlow Thomas Paper Co. He definitely testified that the merchandise shipped to the Wardlow Thomas Paper Co. was the same merchandise as rejected by the Cannon Mills; that he examined the same, and that there was no difference between the merchandise involved in the shipment and Exhibit 2; that Exhibit 2 was not noils. He stated that flax noils come from a spinning mill. We quote the following from his testimony:

Q. What is the source of flax noils?—A. It comes from a spinning mill. The mill using the flax, takes the flax and cleans it. It means a residue. Taking the residue and putting it through a combing machine, and picking out the noil.

Q. A noil is a residue of an operation of a combing machine?—A. As cleaned, it is the result of combing the residue.

Q. What is flax card waste?—A. From a carding machine.

Q. Flax card waste and flax noils have several properties in common, have they not?—A. They have, and have not. Flax card waste is bound to be dirty, but a flax noil, after it is pulled out and cleaned, cannot be dirty.

Q. Can you take Exhibit 2——?—A. I don't have to take it Mr. Place.

Q. And point out to the Court some characteristics exhibited by Exhibit 2, that confirm or negative the fact that it is a noil?—A. Mr. Place, I picked it out before, and there is more in there. I didn't stick that together. There is not a thing on the face of the earth with threads, it is full of threads.

Q. How about a piece of cotton?—A. There could not be any flax in that.

Q. It is conclusive to your mind it is not a flax noil?—A. Yes.

Judge DALLINGER: Have you had experience in buying and selling noils?

The WITNESS: Yes, sir.

Judge DALLINGER: For how many years?

The WITNESS: Thirty years. I just came from lunch with the first man who hired me thirty years ago, and he said you could not get one man in the country to say it was.

This witness was very emphatic that the merchandise had not been tampered with or its quality changed in any respect after it was rejected by the Cannon Mills. He stated that the instant merchandise was unfit for spinning; that since it was full of strings it was not a suitable material for stuffing. Concerning the strings he said "they would cut into it." He stated that Exhibit 7, being the sample the examiner took, was not representative of the 149 bales which he examined but "a different grade of stock entirely."

In order that there may be no misunderstanding as to what the record shows, we quote further from the testimony of this witness:

Q. Did you visit the Wardlow Thomas Paper Mills, with a view of seeing how the shipment made to the Wardlow Thomas Paper Mills compared——?

*       *       *       *       *       *       *

The WITNESS: I wanted to get more business.

**192**

By Mr. Place:

Q. Did you verify this sample which the Cannon Mills sent to your office as a ground of your rejection, on the premises of the Wardlow Thomas Co.?—A. Yes, sir.

Q. Did you in fact examine the merchandise comprising the shipment from the Cannon Mills to the Wardlow Thomas Paper Co., with this sample, which is the basis of the Cannon Mills rejection of the lot?—A. I did.

Q. Have you verified the numbers and marks of the bales?—A. Yes.

Q. Are you satisfied that it was the same merchandise?—A. I have no doubt that it is.

Q. Please state in what characteristics this sample comprising Collective Exhibit 2, resembles the lot of merchandise you saw at the Wardlow Thomas Paper Co., and in what characteristics it differs from that lot, if any?

＊　　　＊　　　＊　　　＊　　　＊　　　＊　　　＊

The Witness: No difference, it is one and the same.

By Mr. Place:

Q. This is a correct representative sample of that lot?—A. Yes, sir.

The cross-examination on the part of Government counsel of this witness does not indicate that he questioned the positive statements of the witness Steck with reference to his examination of the entire shipment and its similarity in character to that of Exhibit 2. If counsel for the Government questioned the fact that Steck had made a proper examination of the entire shipment, or if he desired to know what Steck did with reference to the various bales in doing so, proper questions on cross-examination doubtless would have been asked.

Arthur Rosenfeld, who, as before stated, was a member of the Steck firm, testified very much to the same effect as did Steck. He did not see the merchandise either at the Cannon Mills or at the Wardlow Thomas Paper Co. plant. He showed great familiarity with this kind of merchandise and had dealt in the same for about 18 years. He made the sale of the involved merchandise. He furnished the Cannon Mills a sample sent by the exporter before the shipment was made. He stated that the only outlet for the sale of merchandise like Exhibit 2, during all that time, was for paper making; that Exhibit 7, the official sample, did not correctly represent the shipment; that the sample, Exhibit 2, which represented the shipment was entirely different in quality from the sample by which he originally made the sale to the Cannon Mills; that he never negotiated for the sale of merchandise like Exhibit 2 to a spinning mill; that there was no other outlet for it except the paper mills, and that Exhibit 2 had none of the characteristics of flax noils other than that it had a flax source. He testified definitely that Exhibit 7 might be considered a low-grade type of flax noils and that:

As a rule Government Samplers will take the right material, but Charleston has been a port to which considerable shipments of flax and flax card waste, and flax noils has been shipped. Now there may have been an error. I don't say there has been, but when you have a shipment of sixty five thousand pounds

coming in at one time, and a handful like that is taken out of a corner of a bale, personally I don't see how that could represent so large a shipment, with so small a hand full.

We quote further from his testimony:

R. Q. Is it possible Mr. Rosenfeld, that in a shipment of 149 bales of waste, that in some part of that 149 bales, there may be a small hand full of material such as this?—A. Quite possible.

R. Q. That small handful is not representative of the entire shipment?—A. Correct.

George D. Burns, a dealer in paper mill supplies for 24 years, testified that he had sold flax fibers to spinning mills and to paper mills and that these uses were not interchangeable. He stated that Exhibit 2 was mixed fiber, mixed waste; that it contains jute and cotton; that he would not offer it for sale to a spinning mill but that he would offer it for sale to a paper mill, and that he never knew of any other outlet for such merchandise than a paper mill. He characterized the merchandise represented by Exhibit 2 as a mixed mill waste. He stated that the importation might contain some flax noils but that he could not estimate the amount. We quote a portion of his testimony:

X Q. Will you please look at Exhibit 7, and tell the Court what in your opinion that is?—A. Well I would take a guess at what it was, but I would never attempt to buy and sell on that size sample, a waste of any kind. It is too small. I would take a guess at it.

X Q. What would be your guess?—A. A low grade flax noil.

X Q. You would need a larger sample than this to say with absolute certainty?—A. Yes.

Judge DALLINGER: A flax noil, would it be as dirty as that ordinarily?

The WITNESS: *This is a flax noil waste, misnamed by calling it a flax noil.*

By Mr. WEIL:

X Q. You would not say it is a low grade flax noil?—A. A low grade flax noil is a waste.

X Q. A noil is a waste?—A. I should not say so.

X Q. You would not say so?—A. No, sir, not a flax noil.

X Q. Is it possible with your experience to stick your hand in a bale of merchandise similar to Exhibit 2, and pull out a hand full of material like Exhibit 7?—A. Yes, I have seen bales of mixed waste where you could pull out balls of that kind of material.

X Q. Could you pull out of a handful of merchandise similar to Exhibit 7, from Exhibit 2?—A. I would say not.

James Richard Murphy testified for the Government. He stated that he had had charge of linen thread mills in Paterson, New Jersey, in Massachusetts and in Ireland. He said that "a flax noil is the by-product of the flax tow combed" and that "flax tow is a by-product of the hackling machine." He said that Exhibit 7 was "noils, handled over, and pulled"; that it was flax tow noils; that Exhibit 2, however, in his opinion, was "a mixture of waste."

The testimony of Clarence O. Brown was introduced by the Government. He had been employed in connection with the Customs Service at the port of Charleston, S. C., for 31 years. He had advisorily classified the merchandise as hereinbefore stated. He labeled the sample of the merchandise when he examined it as "flax waste." He stated that Exhibit 7 constituted a small portion of 15 bales out of the lot of 149 bales. He stated that he took the sample from various portions of each of 15 bales, but that Exhibit 7 was a very small part of the sample taken from the various parts of the 15 bales, and that this part was sent to the Customs Information Exchange. He was of the opinion that Exhibit 7 represented a true and correct sample of the merchandise contained in the 15 bales which he examined, but that a large portion of Exhibit 7 had been destroyed for the reasons hereinbefore stated; that he did not know this case was pending when he destroyed the greater portion of the sample. He commented on the great difference in the two samples, pointed out that Exhibit 2 contained a lot of waste, more than Exhibit 7, but that the condition of Exhibit 2 did not exist in the 15 bales which he examined. His testimony was given in 1939 and he took the sample in 1933. He had difficulty in recalling the details as to what his examination disclosed other than what the record showed. He stated that the samples were "entirely" in his custody upon their return from the Customs Information Exchange, and that he did not believe it was possible to confuse the samples.

We have examined with great care the entire testimony contained in the record. It is, of course, obvious that difficulty is encountered in attempting to reconcile all the recited circumstances relating to the two exhibits in controversy. The witnesses are all men of high character, and regardless of any interest some of them might have in the outcome of this litigation, there is no indication in the record that anyone wilfully perjured himself or was guilty of any dishonest conduct in connection with any of the transactions involved.

It seems clear to us that the overwhelming weight of the testimony is to the effect that all the merchandise in the shipment contained a substantial quantity of threads of various materials, which threads were of different colors and sizes, and that the imported merchandise was not flax noils but was a kind of shop waste and was unfit for the purposes for which flax noils are ordinarily used. Flax noils have a far greater value than flax paper stock. Unquestionably the weight of the evidence shows that this material was fit only for paper making. It would be manifestly unfair to require the importer in this case to pay the duty required by said paragraph 1001.

The application of the principles regulating orderly customs administration and the dictates of ordinary common sense require positive, definite, and satisfactory proof to overcome the presumption that the

official sample taken truly represents the character of the merchandise involved. To lightly discard the sample preserved by the Government necessarily involves the opening up of an avenue which may lead to frauds upon the Government's revenues, but we know of no law (certainly none has been pointed out to us) that requires in a proceeding of this character a holding that the representative character of the sample of the merchandise taken by the customs officials must be accepted regardless of its character as shown by convincing testimony. A holding to that effect would amount to placing the rights of importers at the mercy of the actions of customs officials. Surely their actions may be questioned by proper proof. This proof, of course, should be clear and convincing.

The Government points to the fact that the taking of the sample, Exhibit 2, and all the subsequent examinations and transactions relating thereto, occurred outside the Government's custody. The Government has not suggested, however, that testimony may not be received to overcome the presumption flowing from the actions of the customs officials. Notwithstanding the dangers that might be encountered in cases similar to the one at bar, we are constrained to hold and do hold that the evidence of record satisfactorily shows that the entire 149 bales were not the character of flax noils Congress had in mind when it enacted said paragraph 1001, but that merchandise of the class of that at bar has, at no time since long prior to the passage of the Tariff Act of 1930, been fit for or used for any purpose other than that of paper making, and therefore the instant merchandise should have been classified free of duty under paragraph 1750 as paper stock.

The trial court should have sustained the protest *in toto* and held the merchandise classifiable free of duty under paragraph 1750. Without regard to the question of weight, that part of the judgment of the trial court holding that 50 bales were free of duty under paragraph 1750 is affirmed, and that part of the judgment holding the remainder of the importation dutiable under paragraph 1001 is reversed. It is unnecessary to go into the question of the weight of the particular bales in view of the fact that all the shipment, regardless of its weight, is entitled to entry free of duty.

The judgment of the United States Customs Court is modified and the cause is remanded for further proceedings not inconsistent with the views herein expressed.

LENROOT, J., concurs in the conclusion.